**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

MAURICE LIPSEY, individually and on                                    PLAINTIFFS
behalf of all others similarly situated

v.                                        No. 4:16CV00149 JLH

SEECO, INC.; DESOTO GATHERING CO., LLC;
and SOUTHWESTERN MIDSTREAM SERVICES CO.                    DEFENDANTS

<u>**OPINION AND ORDER**</u>

Maurice Lipsey commenced this putative class action against SEECO, Inc., Desoto

Gathering Company, LLC, and Southwestern Midstream Services Company by filing a complaint

in this Court on March 17, 2016. He alleged that the defendants failed to pay him the full amount

of royalties to which he was entitled pursuant to a lease into which he entered with SEECO on April

20, 2005. He invoked this Court's diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Pending before the Court are the defendants' amended motion for summary judgment and Lipsey's

motion for leave to file an amended class action complaint. Document #53; Document #89. The

Court heard oral argument on the pending motions on April 11, 2017. Document #107. During

argument, the Court sua sponte raised the issue of whether the amount in controversy satisfied the

requirement for federal jurisdiction and directed the parties to brief the issue prior to any ruling on

the pending motions. In his brief on the issue, Lipsey conceded that the amount in controversy

satisfies neither the traditional diversity nor the CAFA jurisdictional requirements. Document #106.

In their brief, the defendants asserted that the Court has jurisdiction, arguing that the amount in

controversy exceeds the jurisdictional minimum set forth in CAFA. The Court finds that subject-

matter jurisdiction exists pursuant to CAFA, grants the defendants' amended motion for summary

judgment, and denies Lipsey's motion for leave to file an amended class action complaint.

# I. SUBJECT MATTER JURISDICTION

## A.     The Legal Standard

Challenges to subject matter jurisdiction may be raised at any time prior to final judgment.

*Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571, 124 S. Ct. 1920, 1924, 158 L. Ed. 2d

866 (2004).  The Court is obligated to consider its own jurisdiction and, if necessary, raise the issue

sua sponte.  *Crawford v. F. Hoffman-La Roche Ltd.*, 267 F.3d 760, 764 n. 2 (8th Cir. 2001).  Federal

Rule of Civil Procedure 12(h)(3) codifies this fundamental principle: "If the court determines at any

time that it lacks subject-matter jurisdiction, the court must dismiss the action."  Jurisdiction, of

course, "'depends upon the state of things at the time of the action brought.'"  *Grupo Dataflux*, 541

U.S. at 571, 124 S. Ct. at 1924 (quoting *Mollan v. Torrance*, 22 U.S. 537, 539, 6 L. Ed. 154 (1824)).

The Supreme Court has explained:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal
> court is that, unless the law gives a different rule, the sum claimed by the plaintiff
> controls if the claim is apparently made in good faith.  It must appear to a legal
> certainty that the claim is really for less than the jurisdictional amount to justify
> dismissal.  The inability of plaintiff to recover an amount adequate to give the court
> jurisdiction does not show his bad faith or oust the jurisdiction.  Nor does the fact
> that the complaint discloses the existence of a valid defense to the claim.  But if,
> from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff
> cannot recover the amount claimed *or if, from the proofs, the court is satisfied to a*
> *like certainty that the plaintiff never was entitled to recover that amount*, and that his
> claim was therefore colorable[1] for the purpose of conferring jurisdiction, the suit
> will be dismissed.  Events occurring subsequent to the institution of suit which
> reduce the amount recoverable below the statutory limit do not oust jurisdiction.

*St. Paul Mercury Indem. Co. v. Red Cab. Co.*, 303 U.S. 283, 288-90, 58 S. Ct. 586, 590-91, 82 L.

Ed. 845 (1938) (emphasis added) (footnotes omitted); *see also Sanders v. Hiser*, 479 F.2d 71, 73

---

[1] In addition to meaning "appearing to be true, valid or right," colorable can also mean "counterfeit."  Bryan A. Garner, Black's Law Dictionary (10th ed. 2014), colorable.

(8th Cir. 1973). "The first test for dismissal on jurisdictional grounds—whether the sum claimed by the plaintiff is made in good faith—should be seen as but a linguistic variance of the second—whether it appears to a legal certainty that plaintiff cannot recover the amount demanded." *Zunamon v. Brown*, 418 F.2d 883, 886, n.3 (8th Cir. 1969). In other words, there is one test: legal certainty. The legal certainty standard is satisfied when the "impossibility of recovery [is] so certain as virtually to negative the plaintiff's good faith in asserting the claim." *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011) (alteration in original) (quotation and citation omitted). In this context, "proofs" means "'summary-judgment-type evidence.'" *Martin v. State Farm Fire and Cas. Co.*, 826 F. Supp. 2d 1133, 1136 (D. Minn. 2011) (quoting *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1336 (5th Cir. 1995)).

If the amount in controversy is satisfied when the action is commenced, subsequent events reducing that amount do not "oust jurisdiction." *St. Paul Mercury*, 303 U.S. at 289-90, 58 S. Ct. at 590-91. "Subsequent events may, however, be relevant to prove the existence or non-existence of diversity jurisdiction at the time of filing." *Scottsdale Ins. Co. v. Universal Crop Prot. Alliance*, 620 F.3d 926, 931 (8th Cir. 2010). Courts, including the Eighth Circuit, have distinguished subsequent events that reduce the amount in controversy from subsequently obtained information that shows the amount in controversy failed to satisfy jurisdictional requirements from the action's inception. *Id.*; *see also State Farm Mut. Co. v. Powell*, 87 F.3d 93, 97 (3d Cir. 1996); *Coventry Sewage Assocs. v. Dworkin Realty Co.*, 71 F.3d 1, 4 (1st Cir. 1995); *Tongkook Am. Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 785 (2nd Cir. 1994); *Jones v. Knox Exploration Grp.*, 2 F.3d 181, 183 (6th Cir. 1993); *Am. Mut. Liab. Ins. Co. v. Campbell Lbr. Mfg. Corp.*, 329 F. Supp. 1283, 1286 (N.D. Ga. 1971).

The Eighth Circuit has recognized the inherent tension between the rule that post-filing

events do not divest the court of jurisdiction and the rule that courts may look to post-filing, pre-trial proofs to determine, in hindsight, the amount in controversy at the time of filing. *Schubert*, 649 F.3d at 822. The court has explained that the tension is resolved "by deferring to the plaintiff's estimate with respect to the amount in controversy whenever the impossibility of recovery is not apparent from the face of the pleadings but emerges from adjudication of the merits. Further resort to material developed in discovery is allowed merely to amplify the meaning of the complaint allegations." *Id.* (internal citation and quotation omitted). Here the impossibility of recovery is not apparent from the face of the pleadings; nor has it emerged from adjudication of the merits. The question is whether evidence produced during discovery has amplified the meaning of the complaint allegations so as to demonstrate to a legal certainty that the amount in controversy from the inception failed to meet the minimum required for federal jurisdiction.

## B.    The Record in this Case

Lipsey's complaint requests damages for the defendants' alleged under-measurement of gas, theft of gas, and reduced royalty payments in the amount of $10,000,000; as well as punitive damages in the amount of $15,000,000. Document #1 at 24. Lipsey alleges:

> In the instant matter, it is clear that SEECO received the full "actual amount" of proceeds for all the gas produced, saved, and sold at the time the gas was first sold, and it was only Lipsey and the other royalty owners *who received the rest of their proceeds* at a later date and time.

Document #80 at 9-10 (emphasis added). SEECO paid royalty owners "the rest of their proceeds" through prior period adjustments to the royalty statements.

During oral argument on the defendants' motion for summary judgment, the Court asked defense counsel to explain the accounting issue that gives rise to negative lost and unaccounted for gas, which behooves SEECO to make prior period adjustments to royalty owners. Gas is sold based

4

on British Thermal Units (BTUs), a measurement of energy content. The drier the gas is, the higher

the BTU. This is because less water in the gas means more energy content. Defense counsel

explained that when the gas is measured at the wellhead, a calculation is performed to determine its

BTUs.[2] Upon performing the calculation, an assumption is made regarding the water saturation of

the gas. SEECO assumes the gas at the wellhead is wet, as opposed to dry. Before the gas reaches

the sales point, it is processed to remove excess water molecules. When the gas reaches the sales

point, the BTU calculation is performed a second time. Now that the gas has been processed,

SEECO assumes the gas is dry.

 The lost and unaccounted for gas is the difference between the measurement at the wellhead

and the measurement at the sales point. Normally, the lost and unaccounted for gas is a positive

value, because gas is in fact lost as it travels from the wellhead to the sales point. In this case,

however, the lost and unaccounted for gas is a negative value because of the assumption at the

wellhead that the gas is more water saturated than it is in fact. To account for the negative lost and

unaccounted for gas, SEECO makes a prior period adjustment, which is reflected on its royalty

owners' statements. Lipsey's royalty statements show approximately a two-year delay between the

original compensation for the gas sold and the prior period adjustment for negative lost and

unaccounted for gas. Defense counsel attributed the delay to the fact that SEECO did not initially

know why the BTU calculations rendered a higher measurement at the sales point.

 Prior to the hearing, the Court calculated that SEECO had made $60 in prior period

adjustments to Lipsey, according to the royalty statements before it, which encompasses May of

---

[2] This explanation is corroborated by deposition testimony from defendants' employees.
Document #80-4 at 42; Document #80-7 at 20-23; Document #80-8 at 23-25.

2015 through September of 2016, for royalty checks written on August 25, 2015, through December 25, 2016. After the hearing, Lipsey clarified that the $60 value is the amount of prior period adjustments made to Lipsey's pool, which includes the interests of several other royalty owners and SEECO. The total of Lipsey's prior period adjustments is much less.

The only evidence in the record as to the amount in controversy are the royalty statements covering May 2015 to September 2016. To determine the amount in controversy, the Court must extrapolate from those statements to calculate Lipsey's potential recovery. The relevant statute of limitations, Ark. Code Ann. § 16-56-111(a), provides that Lipsey's action must have been commenced within five years after his cause of action accrued.[3] In his complaint, Lipsey alleges that the defendants knew they were under-measuring the gas but continued to do so without notifying or compensating the royalty owners. Document #1 at 9-10, ¶ 23. For the purposes of calculating the amount in controversy, the Court assumes that Lipsey could prove fraudulent concealment and therefore toll the statute of limitations until he discovered the fraud—when he received the first prior period adjustment in May 2015. *See First Pyramid Life Ins. Co. of Am. v. Stolz*, 311 Ark. 313, 318-19, 843 S.W.2d 842, 845 (1992).

The royalty statements show that Lipsey received approximately $8 in prior period adjustments during the sixteen-month span from May 2015 through September 2016, which adjusted

---

[3] The parties have not briefed whether a three-year or five-year statute of limitations applies and it appears the Arkansas courts have yet to decide. Because the Court can dismiss the complaint for lack of subject matter jurisdiction only if it appears to a legal certainty that the amount in controversy does not satisfy the jurisdictional requirement, the Court will assume the five-year statute applies.

the amounts of royalties paid from November 2013 through September 2014.[4] Document #80-2. For purposes of estimating the amount in controversy, the Court will assume that Lipsey would have received a similar amount in prior period adjustments during the five years preceding the first prior-period adjustment. From this sampling, the Court assumes that Lipsey was owed $30[5] during the five years prior to May 2015, when he first discovered that he had not received the full amount of royalties to which he was entitled. The Court will also assume that Lipsey has continued to receive prior period adjustments since September 2016, when the records end, in the amount of $4.[6]

Discovery has shown that the following were the amounts in controversy: (1) the amount of unpaid royalties plus interest and penalties during the five years prior to when Lipsey received the first prior-period adjustment; (2) the interest and penalties SEECO owes to Lipsey and others similarly situated, based on the delayed prior period adjustments Lipsey received from May 2015 through the present; and (3) any punitive damages and statutory attorney fees deemed appropriate.

## C.  Ordinary Diversity Jurisdiction

"The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a). If Lipsey were to succeed on the merits, SEECO would be liable for 12% interest on the delayed amounts for each year they remained unpaid after the due date. Ark. Code Ann. § 15-74-601(e). If Lipsey also were able to show that the defendants willfully withheld the full royalty

---

[4] Lipsey calculated $8.15. The Court has rounded down to an approximate value of $8. Document #109 at 7.

[5] $\frac{9}{16} = \frac{x}{60}$ ; $x = 30$

[6] $\frac{9}{16} = \frac{x}{8}$ ; $x = 4$

payments to which he was entitled, then SEECO would be liable for an additional 14% penalty on the delayed amounts for each year they remained unpaid after the due date. Ark. Code Ann. § 15-74-602(a).

Because Lipsey did not receive prior-period adjustments from May 2010 to May 2015, the $30 remains unpaid and has remained unpaid for a number of years. To estimate the interest for which the defendants are liable more accurately, the Court apportioned the $30 into each of the five years within the statutory period during which prior period adjustments were not made and multiplied that amount by the number of years it has remained unpaid.

2010   8(6 x .12) = $5.76

          8(6 x .14) = $6.72

2011   7(6 x .12) = $5.04

          7(6 x .14) = $5.88

2012:  6(6 x .12) = $4.32

          6(6 x .14) = $5.04

2013:  5(6 x .12) = $3.60

          5(6 x .14) = $4.20

2014:  4(6 x .12) =$2.88

          4(6 x .14) = $3.36

Total penalty and interest owed = $46.80

Total unpaid royalties = $30

Second, the Court has looked to the royalty statements in the record, which account for prior-

period adjustments made from May 2015 through September 2016.[7]

2(8 x .12) = $1.92

2(8 x .14) = $2.24

Total interest owed = $4.16

Third, the Court has calculated the prior period adjustments that Lipsey has likely received since September 2016, when the royalty statements in the record end.

2(4 x .12) = $0.96

2(4 x .14) = $1.12

Total interest owed = $2.08

Based on this calculation, Lipsey's claim for compensatory damages would amount to $83.04.

Punitive damages are included in the amount in controversy, but the "existence of the required amount must be supported by competent proof." *Larkin v. Brown*, 41 F.3d 387, 388-89 (8th Cir. 1994). "Indeed, when determining the amount in controversy, 'a claim for punitive damages is to be given closer scrutiny, and the trial judge accorded greater discretion, than a claim for actual damages.'" *Id*. (quoting *Zahn v. Int'l Paper Co.*, 469 F.2d 1033, 1034 n. 1 (2d Cir. 1972)). Lipsey requested $15,000,000 in punitive damages in his complaint. Document #1 at 25. The proof does not support such a large reward; the Supreme Court has directed judges and juries to peg the amount of punitive damages to the amount of compensatory damages, using a ratio or maximum multiple.

---

[7] The individual prior period adjustments in the royalty statements before the Court range from $.01 to $2.02. Rather than individually calculate the interest owed on all 68 prior period adjustments—the majority of those adjustments are closer to $.01 than $2.02—the Court will assume for the purposes of calculating the amount in controversy that the entire $8 was owed to Lipsey for a two-year period because the prior period adjustments were typically made about a year-and a half after the initial incomplete royalty payment.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524, 255 L. Ed. 2d 585 (2003) (stressing that no bright-line rule limits the ratio and egregious acts combined with small compensatory damages may justify larger ratio). The defendants suggested the Court use a punitive-compensatory damages ratio of 6:1. Document #108 at 5 (citing *Walker v. Old Reliable Cas. Co.*, No. 4:13CV04122-SOH, 2014 WL 6872903, at *3 (W.D. Ark. Dec. 14, 2014) ("For the purposes of the amount in controversy calculations, the Court notes that a potential punitive-to-compensatory damages ratio of up to 6:1 is acceptable.")). Using this ratio and multiplying Lipsey's compensatory damages in the amount of $83.04 by six, Lipsey's claim for punitive damages, for the purpose of determining the amount in controversy, would amount to $498.24.

Statutory attorney fees count toward the jurisdictional minimum calculation. *Rasmussen v. State Farm Mut. Auto. Ins. Co.*, 410 F.3d 1029, 1031 (8th Cir. 2005). If Lipsey were to succeed on the merits, it would be in the Court's discretion to award a reasonable attorney fee pursuant to the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. § 4-88-113(f). *See G & K Servs. Co., Inc. v. Bill's Super Foods, Inc.*, 766 F.3d 797, 802 (8th Cir. 2014). A "fact-intensive, prospective" analysis of the factors to consider in awarding attorney fees is not appropriate at this stage in the proceedings. *See Basham v. Am. Nat. Cnty. Mut. Ins. Co.*, 979 F. Supp. 2d 883, 890 (W.D. Ark. 2013). Rather, the Court may look to other cases to determine what fee could potentially be appropriate. *See id.* In *Curtis Lumber Co., Inc. v. La. Pac. Corp.*, this Court awarded $75,202.63 in attorney fees pursuant to Ark. Code Ann. § 4-88-113(f) in a case in which the litigation lasted three years, included a four-day jury trial and an appeal, and a jury awarded $50,311.61 in damages for a violation of the Arkansas Deceptive Trade Practices Act. No. 2:08CV00107 JMM, 2011 WL 3203722, at *2 (E.D. Ark. July 27, 2011). Lipsey's case was filed just over one year ago, the parties

have taken several depositions, filed multiple dispositive motions, and prepared for oral argument. But of course, as discussed, Lipsey's damages would be far less than the $50,311.61 awarded in *Curtis*. It follows that the Court can conclude to a legal certainty that a reasonable attorney fee would be less than the amount required to put Lipsey's damages above the $75,000 jurisdictional minimum.

**D.     CAFA**

Although Lipsey has not invoked the Class Action Fairness Act as a basis for jurisdiction, the defendants have. Document #19 at 3, ¶9; Document #20 at 3, ¶9; Document #21 at 3, ¶9. CAFA provides: "The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action." 28 U.S.C. § 1332(d)(2). Lipsey's class action complaint alleges that the class is composed of "more than 10,000 putative class members." Document #1 at 20, ¶51. The defendants say that the evidence has shown that the class is composed of 23,231 putative members—all royalty owners. Document #108 at 4. The evidence has shown, however, that cost-free royalty owners began to receive prior period adjustments in May 2013, where as cost-bearing royalty owners[8] like Lipsey did not begin to receive prior period adjustments until May 2015.[9] Document #80-4 at 34, 48; Document #80-8 at 23, 43. The defendants say there are approximately 15,189 cost-bearing royalty owners included in the putative class. Document #108 at 8, n. 28. Lipsey's compensatory damage

---

[8] A cost-bearing royalty owner gets charged for fuel and lost and unaccounted for gas, as the gas is transported from the wellhead to the sales point, where as a cost-free royalty owner does not incur such a charge. Document #80-4 at 32.

[9] SEECO no longer distinguishes between cost-free and cost-bearing owners when making adjustments for negative L&U because it has switched to a new accounting system. Document #80-4 at 42, 48-49.

claim is approximately $83.04. Assuming that his claim is typical for the putative class, after multiplying the number of cost-bearing royalty owners by $83.04, the class compensatory damages would be $1,261,294.56, which is $3,738,705.44 less than CAFA's minimum of $5,000,000 for subject matter jurisdiction. Therefore, it must be clear to a legal certainty that the class cannot recover the remaining $3,738,705.44 in punitive damages and attorney fees for the Court to dismiss for want of jurisdiction. The Court cannot say to a legal certainty that the class could not recover that amount in punitive damages and attorney fees. Using the 6:1 ratio, an award of punitive damages would increase the total damages to $7,567,767.36.

Because this is not a case where later evidence has shown, to a legal certainty, that the damages never could have exceeded the jurisdictional minimum, the Court has subject-matter jurisdiction based on CAFA.

## II. SUMMARY JUDGMENT

The defendants have moved for summary judgment on all four causes of action alleged in the class action complaint: (1) conversion; (2) unjust enrichment; (3) violation of Ark. Code Ann. § 15-74-708; and (4) violation of the ADTPA. Document #54 at 2. Lipsey has conceded his claims against Southwestern Midstream, the unjust enrichment claim against DeSoto, and his claim for treble damages pursuant to Ark. Code Ann. § 15-74-708. Document #80 at 2-3. Remaining for the Court to analyze are the conversion and ADTPA claims against SEECO and DeSoto and the unjust enrichment claim against SEECO.

### A.    The Legal Standard

A court should grant summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating the absence of a genuine dispute for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the moving party meets that burden, the nonmoving party must come forward with specific facts that establish a genuine dispute of material fact.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A genuine dispute of material fact exists only if the evidence is sufficient to allow a reasonable jury to return a verdict in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party and must give that party the benefit of all reasonable inferences that can be drawn from the record.  *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).  If the nonmoving party fails to present evidence sufficient to establish an essential element of a claim on which that party bears the burden of proof, then the moving party is entitled to judgment as a matter of law.  *Id*.

## B.    Payment of the Statutory Amount

The defendants argue that Arkansas's statutory royalty payment framework bars Lipsey's claims.  Ark. Code Ann. § 15-72-305(a)(3) classifies as "royalty gas" one-eighth of all gas sold.  A lessee who separately sells the gas must remit one-eighth of the sale process "less lawful deductions" to the operator.  Ark. Code Ann. § 15-72-305(a)(3)(B)(i).  The operator in turn distributes the one-eighth to all the royalty interest owners within the drilling unit.  *Id*.  Section 305(a)(6)(A) says that "[p]ayment of one-eighth (1/8) of the revenue realized from the sale of gas as provided in this section shall fully discharge all obligations of the operator and other working interest owners with

respect to the payment of one-eighth (1/8) leasehold royalty or royalty as described under § 15-72-304(d)."

The defendants say first that DeSoto has no obligation to pay Lipsey a royalty pursuant to the statute and second that SEECO discharged its obligation to do so. Document #54 at 2. Lipsey is entitled to a one-eighth royalty pursuant to his lease with SEECO. Document #1 at 27. SEECO argues that regardless of how Lipsey has labeled his claims for underpayment of royalties, they must be dismissed because it has already discharged its statutory duty to distribute to him a 1/8 interest. Document #54 at 6. Megan Martin, the Senior Manager of SEECO's accounting department, stated in an affidavit: "I have reviewed and am familiar with the payment records for the Lipsey Unit. SEECO has paid the statutory one-eighth royalty to Lipsey and the royalty owners in the Lipsey Unit as required by the Arkansas integration statute." Document #55-3 at 3, ¶7.

SEECO's argument overlooks the portion of the statute that sets out time frames within which the payments must be made: "On or before the thirtieth day of the next calendar month following its receipt of the royalty money as provided above, the operator shall distribute the moneys by check or by any form of electronic funds transfer to all royalty owners." Ark. Code Ann. § 15-72-305(5)(A). Moreover, Ark. Code Ann. § 15-74-604(b) requires the operator to pay interest if an operator fails to pay gas royalties to the owner within 180 days after the gas produced under the lease is marketed. The royalty statements show that in several instances Lipsey was not fully compensated until almost two years after SEECO made its initial royalty payment and deposition testimony corroborates the royalty statements. *See* #80-4 at 42; Document #80-7 at 20-23; Document #80-8 at 23-25. SEECO's untimely payments do not serve to discharge "all obligations" with respect to those payments, given the time limits and the penalties imposed for a failure to

comply with those time limits.

## C.    Conversion

Arkansas law defines conversion as "the exercise of dominion over property in violation of the rights of the owner or person entitled to possession." *City Nat'l Bank of Fort Smith v. Goodwin*, 301 Ark. 182, 187, 783 S.W.2d 335, 337 (1990) (internal quotations omitted). Lipsey argues that the undermeasurement of gas at the wellhead constitutes tortious conversion. Document #80 at 15-18. To succeed on a claim for conversion, Lipsey must show that he owned or was entitled to possess the gas. *See Big A Warehouse Distribs., Inc. v. Rye Auto. Supply, Inc.*, 19 Ark. App. 286, 291-92, 719 S.W.2d 716, 718-19 (1986). In *Hillard v. Stephens*, the lessors of seven gas leases sued the lessee, contending that royalties had been underpaid. 276 Ark. 545, 550, 637 S.W.2d 581, 583 (1982). One of the issues before the Arkansas Supreme Court in *Hillard* was whether the "contract price" that the lessee received according to the gas purchase contracts with the third-party purchaser was the "prevailing market price at well" under five of the seven leases. *Id*. at 550, 637 S.W.2d at 583. The court held that it was, reasoning:

> The gas lease constitutes a present sale of all the gas in place at the time such lease is executed; and as the gas leaves the well head, the entire ownership thereof is in the lessee, none being reserved in the lessor. Once the lessee-producer drills a well resulting in the commercial production of natural gas on the leased premises, the lessee-producer has the immediate duty to market the gas.

*Id*. (emphasis added). Lipsey granted SEECO the right to produce gas from his land and to sell the gas produced. Document #1 at 27. He gave up any ownership interest or right to possess the gas in exchange for royalties. Once the gas was produced, SEECO owned it and was entitled to possess it. Therefore, while the defendants undermeasured the gas at the wellhead by assuming the gas

contained more water than it did, the defendants did not convert the gas.[10]

Lipsey also argues that the withholding of royalties owed to him under the lease constitutes tortious conversion. Document #80 at 18-21. While the existence of a contractual relationship between Lipsey and SEECO does not bar Lipsey from bringing an action against SEECO in tort, the tort claim must be "independent" of the breach of contract claim. *Westark Specialties, Inc. v. Stouffer Family, Ltd. P'ship*, 310 Ark. 225, 836 S.W.2d 354, 358 (Ark. 1992). "Generally, a breach of contract is not treated as a tort if it consists merely of a failure to act (nonfeasance) as distinguished from an affirmatively wrongful act (misfeasance)." *L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 9, 665 S.W.2d 278, 281 (1984) (citing *Morrow v. First Nat. Bank of Hot Springs*, 261 Ark. 568, 550 S.W.2d 429 (1977)). "A plaintiff may not transform a breach of contract action into a tort claim by alleging the breach was motivated by malice. The breach itself simply is not a tort." *Quinn Companies, Inc. v. Herring-Marathon Grp., Inc.*, 299 Ark. 431, 432, 773 S.W.2d 94 (1989). Lipsey contends that SEECO failed to pay him one-eighth of the proceeds derived from the sale of all gas it produces, saves, and sells, as required by the lease. That is an ordinary breach of contract claim; it is not a conversion claim. *See JS Interests, Inc. v. John Hafner & Assocs.*, No. 4:16CV00586-BSM, Document #15 at 4 (E.D. Ark. Feb. 2, 2017).

## D.    Unjust Enrichment

Unjust enrichment is an equitable doctrine based on the notion that a person should not become unjustly enriched at the expense of another and should be required to make restitution for the unjust enrichment received. *See Campbell v. Asbury Auto., Inc.*, 2011 Ark. 157, 21, 381 S.W.3d

_____

[10] Lipsey attempts to distinguish between gas leaving the wellhead and gas at the wellhead, arguing that DeSoto measures the gas before it leaves the wellhead. Document #80 at 15. It does not matter, however, because once the gas was produced Lipsey no longer retained an interest in it.

21, 36. "[A]n action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain." *Campbell*, 2011 Ark. 157 at 21, 381 S.W.3d at 36. The measure of damages is the amount of unfair gain received by those unjustly enriched. *Id*. Generally, unjust enrichment does not apply when an express contract exists. *Davis v. Davis*, 2016 Ark. App. 33, 11, 480 S.W.3d 878, 885 (citing *Coleman's Serv. Ctr., Inc. v. F.D.I.C.*, 55 Ark. App. 275, 299, 935 S.W.2d 289, 302 (1996)). The Eighth Circuit explained the general rule:

> The reason for the rule that someone with an express contract is not allowed to proceed on an unjust enrichment theory, is that such a person has no need of such a proceeding, and moreover, that such a person should not be allowed by means of such a proceeding to recover anything more or different from what the contract provides for.

*United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 609 (8th Cir. 2009). However, pleading unjust enrichment as an alternative to a breach-of-contract claim is allowed in certain circumstances under Arkansas law. *See, e.g.*, *Klein v. Arkoma Prod. Co.*, 73 F.3d 779, 786 (8th Cir. 1996); *Friends of Children, Inc. v. Marcus*, 46 Ark. App. 57, 61, 876 S.W.2d 603, 605-06 (1994); 1 Howard W. Brill, *Arkansas Law of Damages* § 31:2 (5th ed. 2015). For example, when an express contract does not fully address a subject, a court may impose a remedy to further the ends of justice. *Klein*, 73 F.3d at 786; *Access Mediquip, LLC v. St. Vincent Infirmary Med. Ctr.*, No. 4:11CV00695, 2012 WL 4359055 at *6 (E.D. Ark. Sept. 21, 2012); *QHG of Springdale, Inc. v. Archer*, 2009 Ark. App. 692, 9, 373 S.W.3d 318, 324.

Lipsey argues that his unjust enrichment claim against SEECO is not precluded by the existence of an express contract because he is not seeking to recover anything more or different from what the contract provides for. Document #80 at 23. While the possibility of a greater or different

recovery is part of the rationale for the rule, it is not the rule. *See Tuohey v. Chenal Healthcare, LLC*, 173 F. Supp. 3d 804, 813 (E.D. Ark. 2016). The rule is that unjust enrichment does not apply when a contract exists, except in certain circumstances; Lipsey does not argue that any of those circumstances are present in this case. *See Wallace v. XTO Energy, Inc.*, No. 4:13CV00608 KGB, 2014 WL 4202536 at *2 (E.D. Ark. Aug. 22, 2014); *Collins v. SEECO, Inc.*, No. 4:11CV761 DPM, 2012 WL 2309080 at *2 (E.D. Ark. June 18, 2012). Rather, Lipsey argues that SEECO was unjustly enriched because it failed to pay him royalties as promised in the lease. The lease covers the royalties owed, so unjust enrichment does not apply in this case. Document #80 at 23.

## E.    Arkansas Deceptive Trade Practices Act

The Arkansas Deceptive Trade Practices Act protects Arkansas consumers from a variety of unfair and deceptive practices, but its "safe harbor provision" precludes its application to "[a]ctions or transactions permitted under laws administered by the Insurance Commissioner, the Securities Commissioner, the State Highway Commission, the Bank Commissioner, or other regulatory body or officer acting under statutory authority of this state or the United States, unless a director of these divisions specifically requests the Attorney General to implement the powers of this chapter . . . ." Ark. Code Ann. § 4-88-101(3). The defendants argue that because their conduct—producing, measuring, saving, and selling natural gas, and distributing royalties—is permitted under laws administered by the Arkansas Oil and Gas Commission, there is no dispute as to whether the safe harbor provision precludes any action against them by a private citizen.

The safe harbor provision has been interpreted broadly. In *Arloe Designs v. Ark. Capital Corp.*, the Arkansas Supreme Court held that the Act did not apply to a nonprofit, which was subject to the supervision of the Arkansas State Bank and the Arkansas State Board of Finance, and a

national bank, which was regulated by the Office of the Comptroller of Currency and the Federal

Deposit Insurance Commission. 2014 Ark. 21, 6, 431 S.W.3d 277, 281. The court stated:

> Because both [the nonprofit] and [the national bank] are regulated by a regulatory
> body acting under statutory authority of Arkansas or of the United States, their
> actions and transactions are not subject to claims that can be brought under the
> ADTPA unless a specific request has been made to the Attorney General.

*Id*. The safe-harbor provision precludes actions pursuant to the Act against regulated entities

engaged in regulated conduct. *See Ford v. Citimortgage, Inc.*, No. 3:15CV00206-DPM, 2015 WL

7429990 at *2 (E.D. Ark. Nov. 20, 2015) (holding "[n]o private right of action exists against

CitiMortgage, a regulated entity, in the absence of the Attorney General declining to proceed.");

*Gabriele v. Conagra Foods, Inc.*, No. 5:14CV05183-TLB, 2015 WL 3904386 at *7 (W.D. Ark.

June 25, 2015) (holding "[c]onsistent with the plain language of the ADTPA, it appears that the

Arkansas Supreme Court recognizes and applies the so-called general-activity rule. In other words,

the safe-harbor provision exempts regulated conduct by regulated actors regardless of whether

substantive state law explicitly authorizes or prohibits the precise conduct at issue.").

The Arkansas Oil and Gas Conservation Act created the Commission in 1939. Act 105, § 2,

1939 Ark. Acts 219, 219-20. One of the Commission's duties is to protect the rights of royalty

owners like Lipsey. Ark. Admin. Code 178.00.1-A-1. Its regulatory functions include issuing

permits to drill natural gas, issuing authority to operate and produce wells, and conducting

administrative hearings to enforce provisions of the oil and gas statutes and regulations. Ark. Code

Ann. § 15-71-110. The Commission has "authority over all persons and property necessary to

administer and enforce effectively the provisions of [the Arkansas Oil and Gas Conservation Act]

and all other statutory authority of the commission relating to the exploration, production, and

conservation of oil and gas." Ark. Code Ann. § 15-71-110(a)(1). "Production of natural gas

includes both the production facilities and production process." Ark. Code Ann. § 15-71-110(a)(2). "'Production process' means the extraction of gas from the geological source of supply to the surface of the earth, then through the lines and equipment used to treat, compress, and measure the gas between the wellhead and the meter where it is either sold or delivered to a custodian other than the well operator for gathering and transport to a place of sale." Ark. Code Ann. §15-71-110(b)(2).

The defendants are regulated entities. Ark. Admin. Code 178.00.1-A-5(a)(3). SEECO was in charge of the development of Lipsey's lease, as well as the operation of producing wells in connection with the lease. Ark. Admin. Code 178.00.1-A-4. Desoto contracts with SEECO to gather, compress, treat, and market the gas in SEECO's pipelines and is therefore a person involved in the production of gas. Document #80-4 at 4. The question is whether the conduct at issue is regulated conduct. Lipsey says that he relies on statutes that the Commission does not administer, that Desoto's measurement of gas is unregulated, and that neither SEECO nor Desoto answer to the Commission for how they calculate negative lost and unaccounted for gas. Document #80 at 25-26. But the essence of this action is the underpayment of royalties. How the defendants measured the gas and calculated negative lost and unaccounted for gas are material to whether the defendants failed to pay Lipsey the royalties to which he was entitled. The measurements and calculations are not, therefore, "unregulated conduct" because the payment of royalties is regulated by the Commission. Ark. Code Ann. § 15-74-709(a)(1) ("The Oil and Gas Commission is hereby authorized to receive and investigate complaints of oil and gas royalty owners that their lessees or others responsible for the payment of royalty are in default of their lease agreements . . ."). Lipsey's cause of action for the defendants' alleged violations of the Arkansas Deceptive Trade Practices Act is barred by the safe harbor provision.

**F.      Conclusion as to the Claims in the Original Complaint**

For the reasons stated, the defendants are entitled to judgment as a matter of law on all of the claims asserted in the original complaint.

## III.  LEAVE TO AMEND

Lipsey has requested leave to amend the class action complaint in order to add several claims for relief.  Document #89 at 2, ¶¶3-4.  Those claims are breach of contract, violation of Ark. Code Ann. § 15-72-305, violation of Ark. Code Ann. § 15-74-307, violation of Ark. Code Ann. § 15-74-601, fraud and constructive fraud, and misfeasance, malfeasance, nonfeasance, and neligence.  Rule 15 provides that the Court should freely give leave to amend when justice so requires.  Fed. R. Civ. 15(a)(2).  "A district court may deny leave to amend 'if there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment.'" *Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 922 (8th Cir. 2013) (quoting *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008)).  *See also Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962).

"Denial of a motion for leave to amend on the basis of futility [usually] 'means the district court has reached the legal conclusion that the amended complaint could not withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'" *Zutz v. Nelson*, 601 F.3d 842, 850 (8th Cir. 2010) (quoting *Cornelia I. Crowell GST Trust v. Possis Med., Inc.*, 519 F.3d 778, 782 (8th Cir. 2008)).  In this case, however, Lipsey moved to amend his complaint in response to the defendants' motion for summary judgment, the amended claims rely on evidence produced during discovery, and the parties have cited that evidence in support of their positions.  Therefore, even if

the amended complaint would state a plausible claim, the Court may deny the amendment as futile if the new claim would not survive summary judgment. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).

Undue delay also can be a reason to deny leave to amend. The Eighth Circuit said that in *most* cases delay alone is not a sufficient reason for denying leave to amend; prejudice to the nonmoving party also must be shown. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (citing *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998)). In a case in which the district court denied leave to amend on the ground of futility, the Seventh Circuit affirmed on an alternative ground of undue delay and offered guidance as to when undue delay alone may be a sufficient reason to deny leave to amend. *Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2011). There, the Seventh Circuit held that leave to amend should be denied because the plaintiff did not seek to add a claim until after the close of discovery and after the defendant had filed its motion for summary judgment; the factual basis for the new claim was virtually identical to the factual basis for the claim originally alleged, so the plaintiff could have brought the proposed new claim at the time it filed its original complaint; and the plaintiff offered no explanation for waiting until it was faced with a summary judgment motion before attempting to add the new claim. *Id.*; *see also* 6 Arthur R. Miller, et al., Fed. Prac. and Proc.§ 1488 (3 ed. 2017).

In light of *Bethany Pharmacal*, the considerations that weigh against allowing Lipsey to amend his complaint are that he proposed his amendments in response to a motion for summary

judgment,[11] and he offers no convincing explanation as to why these new theories of relief were not alleged from the commencement of the action. Although the proposed amended complaint includes a new class definition that appears to be based on information gained during discovery, the factual bases for the new theories of relief were known to Lipsey when he filed his initial complaint. The considerations that weigh in favor of allowing leave are that Lipsey sought leave to amend his complaint less than a year after commencement of the action, which, for a case of this nature, is not an inordinate delay, and he sought leave before the time for amending his pleading had expired.[12] Furthermore, the pending motion for leave to amend is Lipsey's first such motion.

Ordinarily, when a plaintiff seeks leave to amend for the first time before the time for seeking such leave has expired, less than a year after commencement of the action, leave to amend will be granted. Here, however, there is more to the story. Although this case had been pending only eleven months when Lipsey sought leave to amend, the litigation is actually older than that. This case is one of a series of cases addressing substantially similar issues. Document #27 at 1. Much discovery relevant to this case had been taken in the prior cases. *Id.* In fact, Lipsey's initial complaint attempts to incorporate by reference discovery from prior litigation. Document #1 at 15,

---

[11] The defendants filed an amended motion for summary judgment on November 23, 2016. Document #53. Lipsey filed an amended complaint, without leave of court, on January 27, 2017, simultaneously with the filing of his response to the amended motion for summary judgment. *See* Documents #79 and #80. The Court then granted a motion by the defendants to strike the amended complaint on February 6, 2017. Document #87. Lipsey then filed the pending motion for leave to file an amended complaint on February 9, 2017. Document #89.

[12] The parties submitted an amended Rule 26(f) report on October 25, 2016, and were proceeding by agreement on the deadlines provided in that report. The proposed deadline for amending the class action complaint was January 17, 2017. Document #51 at 2. Lipsey filed a motion to extend the time to amend the complaint and class definition, and that motion was granted up to and including January 27, 2017. Document #73.

¶32 and Document #24. The parties agreed in their Rule 26(f) report that discovery from two prior cases could be used in this case. Document #26 at 4.

In addition, the defendants initially moved for summary judgment on August 30, 2016. Document #35. That motion asserted essentially the same grounds as the amended motion, which now has been granted. The Court denied that motion on September 2, 2016, noting that discovery had barely begun. Document #46 at 1. The Court also noted that the defendants' arguments were based on purely legal grounds, that the defendants had not filed a motion under Rule 12(b)(6), and if they had done so, and if the Court had agreed with their arguments, the plaintiff likely would have been given at least one opportunity to amend. *Id.* at 2. The Court pointed out, however, that a grant of summary judgment would be a final judgment on the merits, which would bar an opportunity to amend. *Id.* Thus, Lipsey was on notice in late August or early September of 2016 that the defendants were contending that his claims would fail as a matter of law and that he should consider amending his complaint; and he was on notice that if the Court granted summary judgment, it likely would deny a motion for leave to amend. Having denied the motion for summary judgment at that time in order to allow Lipsey to take discovery, it would be unfair to the defendants—after they have completed several months of subsequent discovery and filed a meritorious amended motion for summary judgment—now to allow Lipsey to amend his complaint and state theories of relief that could have been the subject of the earlier discovery and could have been addressed in the defendants' amended motion for summary judgment.

Furthermore, many, if not all, of the proposed new claims would not survive a motion to dismiss or a motion for summary judgment and therefore amendment would be futile.

The heart of Lipsey's claim arises under the Arkansas Code Annotated § 15-74-601, which

governs the time within which royalties must be paid to royalty owners. His monetary claims all reduce to the proposition that SEECO has not paid all of the royalties due within the time required by this statute. Section 601 provides that a person who fails to pay royalties on time must pay to the royalty owner 12% interest on the delayed amounts for each year they remained unpaid after the due date. Ark. Code Ann. § 15-74-601(e). Section 603 states:

> (b) If persons legally entitled to the proceeds seek relief for the failure of the purchaser to make timely payment of proceeds from the sale of oil or gas or interest thereon as required in §§ 15-74-601 and 15-74-602, the first purchaser or the owner of the right to produce under an oil or gas lease or force pooling order shall be furnished with written notice of the failure as a prerequisite to commencing judicial action for the nonpayment.

> (c) The first purchaser shall have thirty (30) days after receipt of the required notice within which to pay proceeds or to respond in writing with a reasonable basis for nonpayment.

Ark. Code Ann. §15-74-603. It is undisputed that Lipsey failed to provide the required written notice of the failure to make timely royalty payments. Document #94 at 12. Therefore, he cannot recover under this statute.

Lipsey also seeks to add a claim for violation of Ark. Code Ann. § 15-72-305, which requires an operator to pay one-eighth of the revenue realized from the sale of gas subsequent to an Arkansas Oil and Gas Commission order creating a drilling unit. Document #90-1 at 27-28, ¶¶ 62-63. Section 305 authorizes the Commission to file a legal proceeding to compel an operator to remit revenues in accordance with the statute, but it does not confer a private right of action on royalty owners like Lipsey. Ark. Code Ann. § 15-72-305(b).

In addition, Lipsey seeks to add claims for violation of Ark. Code Ann. § 15-74-707, which governs a purchaser's duty pay the royalty interest and to provide royalty statements in a timely manner, and for violation of Ark. Code Ann. § 15-74-701, which states that any person who willfully

or maliciously violates the provisions of subchapter 7—including section 707—"shall be deemed guilty of a misdemeanor and upon conviction shall be fined in any sum of not less than one hundred dollars ($100) nor more than five hundred dollars ($500)." Document #90-1 at 28-29, ¶¶64-68. There is no civil remedy for violations of subchapter 74. Rather, there is a criminal penalty. Lipsey cannot bring a civil action to impose on a criminal penalty on the defendants.

Lipsey also seeks to allege claims for breach of contract, fraud and constructive fraud. Document #90-1 at 26-27, ¶¶58-61 and at 30-32, ¶¶ 74-79. He attached a copy of the lease to his original complaint and sought relief for underpayment of royalties but did not assert a breach of contract claim. Lipsey alleged that the defendants knew they were under-measuring the gas but continued to do so without compensating or disclosing the underpayment to the royalty owners, while at the same time providing misleading royalty statements. He did not, however, label his claims as claims for fraud or constructive fraud. Document #1 at 9-10, ¶ 23. Lipsey alleges, in substance, the same basic facts in the amended complaint but explicitly labels them as fraud or constructive fraud. Document #90-1 at 30, ¶¶ 74-75.

He also seeks to add claims for misfeasance, malfeasance, nonfeasance, and negligence based on allegations that the defendants owed him a duty and breached that duty. Document #90-1 at 31, ¶¶ 80-81. Under Arkansas law, nonfeasance "means not doing the thing at all, as distinguished from misfeasance, which means doing it improperly." *Findley v. Time Ins. Co.*, 264 Ark. 647, 573 S.W.2d 908, 911 (1978). Neither is an independent cause of action; rather, conduct that constitutes misfeasance may support a cause of action in tort while nonfeasance generally does not support a cause of action in tort. *GeoVera Specialty Ins. Co. v. Graham Rogers, Inc.*, 636 F.3dc 445, 451 (8th Cir. 2011). Malfeasance is a wrongful, unlawful, or dishonest act and the term

malfeasance is used to describe wrongdoing by a public official under Arkansas law. Black's Law Dictionary (10th ed. 2014), malfeasance; Ark. Code Ann. § 21-12-302. It is not an independent tort. Any allegations of misfeasance, malfeasance, and nonfeasance would be subsumed into Lipsey's negligence claim.

These common-law claims are all that remain of Lipsey's proposed amended complaint. Without reaching the issue of whether it would be futile to allow Lipsey to amend his complaint to allege these claims, after a review of the record as a whole, the Court has concluded that in the interest of justice leave to amend should be denied as to these proposed claims based on the Seventh Circuit's guidelines in *Bethany Pharmacal*. 241 F.3d at 861. The factual allegations upon which Lipsey's common-law theories of relief are based are the same factual allegations that form the basis of Lipsey's original complaint. As noted, Lipsey attached the lease to his original complaint and sought recovery for underpayment of royalties. Likewise, in his original complaint, Lipsey alleged that the proposed class action arose "from the Defendants' unlawful scheme to systematically deprive royalty owners of millions of dollars in royalty payments by performing and relying upon measurements taken at the wellhead and at various points on the gathering system which they know to be wholly inaccurate." Document #1 at 6, ¶15. That allegation is repeated verbatim in the proposed amended complaint. Document #90-1 at 8, ¶16. The original complaint also alleged that this scheme had been concealed from the royalty owners in the royalty statements. *Id*. at 13, ¶¶27-28. The substance of that allegation reappears in the proposed amended complaint. Document #90-1 at 18, ¶33. These allegations formed the factual basis for Lipsey's claims of conversion, unjust enrichment, and violation of the ADTPA in the original complaint; they likewise form the factual basis for Lipsey's common-law claims in the proposed amended complaint. Lipsey offers no

convincing reason for not including his claims for breach of contract, fraud and negligence in the original complaint. Had he done so, those claims could have been addressed during discovery and during the proceedings on the amended motion for summary judgment. The defendants litigated in good faith based upon the theories of relief in the original complaint, participated in a substantial amount of discovery in addition to the discovery conducted in prior, related cases, and filed a meritorious motion for summary judgment based on the theories in Lipsey's original complaint. Much of this litigation activity occurred after the defendants put Lipsey on notice that his original complaint was legally defective and after this Court put him on notice that a meritorious summary judgment motion likely would preclude granting leave to amend. It would be prejudicial to allow Lipsey, at the conclusion of this process, to change his theories of relief when he has offered no convincing reason as to why these theories were not asserted earlier and it appears that they are offered now solely to avoid summary judgment.[13]

---

[13] Lipsey's breach of contract claim appears to duplicate the claim for failing to pay royalties within the time prescribed by A.C.A. § 15-74-601. The contract does not specify a time within which SEECO must pay royalties. In the absence of such a provision, Arkansas law generally would require that payment be made within a reasonable time. *Excelsior Mining Co. v. Willson*, 206 Ark. 1029, 1032, 178 S.W.2d 252, 254 (1944). Here, the statute supplies the time within which payment must be made. If the contract claim were to go forward, the statutory time frame would be deemed reasonable as a matter of law; but that would allow Lipsey to evade the statutory requirement that he give written notice before commencing judicial action for nonpayment. No Arkansas case has decided whether a royalty owner can commence judicial action for nonpayment and evade the notice requirement by labeling the claim as one for breach of contract. The same issue would arise for Lipsey's common-law fraud claim. *See* Ark. Code Ann. § 15-74-602.

**CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED and

Lipsey's motion for leave to file an amended class action complaint is DENIED.

IT IS SO ORDERED this 20th day of June, 2017.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE